Alvie **WILCOX**, Guardian of the Estate of James E. Wilcox, a Minor, (Plaintiff) Appellant,

v.

**ST. LOUIS–SOUTHWESTERN RAILROAD COMPANY, a Corporation, and Norvel W. Duncan, Administrator of the Estate of William E. Childs, Deceased, (Defendants) Respondents.**

**No. 52204.**

Supreme Court of Missouri, Division No. 1.

July 10, 1967.

Motion for Rehearing or to Transfer to Court en Banc Denied Sept. 11, 1967.

Charles M. Cable, Kennett, James W. Jeans, St. Louis, for appellant.

Coburn, Croft & Kohn, Thomas L. Croft, Alan C. Kohn, St. Louis, for defendant-respondent, St. Louis Southwestern Railroad Co.

HOLMAN, Judge.

Plaintiff, through his guardian, filed this suit in an effort to recover damages in the amount of $500,000 for personal injuries he received when the car in which he was riding was struck by a train. Defendants are St. Louis-Southwestern Railroad Company and Norvel W. Duncan, administrator of the estate of the driver of the car. The jury returned a verdict for plaintiff and against Duncan in the sum of $108,000, and in favor of the defendant railroad company. Plaintiff has duly appealed and his only contentions here relate to the admission of certain evidence offered by the railroad company.

Plaintiff's case against the railroad was submitted upon the theory that his injuries resulted from the negligence of the engineer in that he "knew or by the use of ordinary care could have known that there was a reasonable likelihood of collision in time thereafter to have slackened the speed of the train but he failed to do so."

The collision in question occurred about noon on September 18, 1964. Earlier that

morning plaintiff's uncle, William E. Childs, the driver of the car involved, accompanied by his father-in-law, Mr. Mize, had stopped by the Wilcox home. When they indicated that they planned to go fishing plaintiff and his younger brother John were given permission to go with them. They were en route to a "fishing spot" when the collision occurred. It was a bright clear day and the pavement was dry. The accident occurred on Highway "K", a north-south blacktop public road 18 feet wide. A single track of the defendant railroad company crossed Highway K at an angle in a northeasterly-southwesterly direction. The track is straight and level. The road is straight and as it approaches the track from the south there is a gradual rise of about one foot every 100 feet for a distance of 300 feet. A railroad crossbuck sign was located 20 feet south of the nearest rail six feet east of the east edge of the highway. A house was located on the east side of the highway approximately 700 feet south of the center of the track. There was a railroad warning sign 604 feet south of the crossing. A tree frequently referred to in the evidence was located 371 feet east of the center of the highway on the south edge of the railroad right-of-way. The train was approximately 150 feet in length and consisted of a Baldwin switcher-type locomotive pulling an empty flatcar and a caboose. The locomotive was traveling rear end first which placed the engineer on the left side of the cab. The head brakeman, Earl Venable, was riding on the right side of the cab.

Mr. Childs and Mr. Mize were both killed in the collision, and plaintiff and his brother were injured in such a manner that neither retained any memory of the facts relating to the collision.

Harry Johnson, the engineer on the locomotive at the time in question, called as a witness by plaintiff, testified that the engine had no speedometer or speed tape, but he gave it as his "estimate or best judgment" that the train was traveling from 30 to 32 miles per hour as it approached the crossing. He further testified that he saw the automobile approaching from the south when it was about 700 feet from the crossing and was going at a speed which he estimated at 60 m.p.h.; that the engine was then 371 feet from the crossing; that he blew the whistle continuously after he saw the car, giving first the normal whistle and then a series of short alarm whistles as the train neared the crossing; that he noticed a slackening of the speed of the automobile as it "drifted" to the right; that although he had his hand on the brake lever from the time he first saw the automobile he did not make any application of the brake until he made a service application four or five feet before impact, and at the moment of impact made an emergency application. Apparently his explanation for not having applied the brake earlier was that after the car got to a point where it could not have been stopped before reaching the crossing, he knew he could not have applied the brakes and slowed the train before it reached the crossing. He stated further that the car was traveling from 25 to 30 m.p.h. at the time of the collision, and that it was his opinion that the car's stopping distance at a speed of 60 m.p.h. was 251 feet.

On direct examination Mr. Johnson stated that he could have slowed the train to 20 m.p.h. in 100 feet. On cross-examination he attempted to explain that answer by stating that he meant that such reduction could be made in 100 feet after the brakes took effect; that there is a lapse of five or six seconds after either a service or emergency application before there is any reduction in the speed of the train.

Robert Boehlow, a driver's education instructor, testified that an automobile in good condition traveling at a speed of 60 m.p.h. could be stopped in 272 feet, of which 66 feet is reaction time and 206 feet braking distance; that a car going 25 m.p.h. would move at the rate of 38 feet per second, and at 30 m.p.h. would move at 44 feet per second; that the Chevrolet Nova here involved was 15 feet 7 inches long and that it would have passed the 11-foot-wide locomotive in

$^{27}\!/_{44}$ of a second traveling 30 m.p.h., and in $^{3}\!/_{4}$ of a second at 25 m.p.h.

A highway patrolman, Richard Hurst, testified that he arrived at the scene shortly after the collision and that he found a skid mark which began 136 feet south of the rail but which left the highway on the right side 38 feet south of the rail. From the skid mark and other evidence he estimated the speed of the automobile at 50 m.p.h. when the brakes were applied and 25 m.p.h. at the time of impact. He further stated that the crossarm located just south of the crossing had been knocked down and that his measurements showed that the train stopped 395 feet beyond the point of impact.

As indicated, the only points raised on this appeal relate to the admission of certain testimony concerning brake tests made by the defendant railroad company on January 19, 1966. Plaintiff contends that if there had been a reduction of the speed of the train to the extent that it would have arrived at the collision point about $^{3}\!/_{4}$ of a second later than it did, the car would have crossed the tracks ahead of the train and the collision would not have occurred. The day the tests were made was a very cold dry day. Present were John William Bland, professional engineer, Clifford Kifer, District Engineer for Westinghouse Air Brake Company, and Edward E. Bergman, a retired railroad employee with considerable air brake experience. Also present were the following employees of defendant railroad: Ralph Miller, road foreman of engines, J. R. Johnson, conductor, William Ware, superintendent of the branch line involved, Earl Venable, brakeman, and the company attorneys. The train used in the tests consisted of a Baldwin engine, No. 1024, which was purchased at about the same time and was said to be a "sister engine" of the one involved in the collision, the same type flatcar, and the identical caboose as those on the accident train. Distance marks were made every 44 feet for some distance east of the crossing. Mr. Bland was stationed at a point near the crossing and Mr. Kifer at a point 220 feet east of the crossing. Bergman and Miller were in the cab. The test engine was equipped with a speedometer. The first test was made in order to test the accuracy of the speedometer. The engineer ran the train toward the crossing at a speed of 30 m.p.h. As it passed Kifer he made a signal with his arm, at which time Bland, on the ground, and Bergman in the cab, started their stop watches. When the train reached Bland, the watches were stopped and both showed that the train had used five seconds in moving 220 feet, which indicated that it had traveled at 30 m.p.h. The second test was performed in exactly the same manner as the first, except that when the engine passed Kifer, the engineer made an emergency application of the brake and the stop watches showed that it had taken five seconds to traverse the 220 feet, thus indicating that there had been no slackening of the speed of the train in that distance. However, the total stopping distance of the train on the second test was measured to be 497 feet. Since the stopping distance on the date of the collision was 395 feet after application of the emergency brake, a further test was made in order to determine the speed a train would be traveling in order for the emergency brake to stop it in approximately 395 feet. A test of the train operating at 27 m.p.h. showed a total stopping distance of 402 feet, slightly more than the stopping distance on the date of the accident. Also, the test at 27 m.p.h. showed that the train began to slacken speed when it had traveled 178 feet after application of the emergency brake.

■ The first contention is that the court erred "in permitting defendant to adduce evidence concerning a test which had been conducted by the railroad for the purpose of ascertaining the capacity of a Baldwin switcher engine pulling an empty flatcar and a caboose to slacken speed with an emergency braking action while traveling at a speed of thirty miles per hour." It is said that the validity of the test depended upon proof that the test conditions were substantially similar to the conditions which

existed on the day of the collision, and that there was no direct evidence concerning the condition of the engine on the accident train. We do not agree that the court erred in that regard. It is elementary that evidence of experiments is admissible, in the discretion of the trial court, upon a showing of similar conditions. We have said that, generally speaking, "experimental evidence is admissible, in the sound judicial discretion of the trial court, when it is shown that the experiment was conducted under conditions substantially similar in essential particulars to the conditions prevailing at the time of the occurrence in suit. However, it is not required that the conditions surrounding the experiment should have been precisely identical with those surrounding the occurrence under investigation; and, if the conditions were substantially similar, the differences in condition are for the jury in evaluating the weight to be given such evidence." Faught v. Washam, Mo., 329 S.W.2d 588, 598. The admission of evidence of tests much like those performed in the instant case was approved in Burg v. Chicago, R. I. & P. Ry Co., 90 Iowa 106, 57 N.W. 680 [5], and Washington v. Long Island Railroad Co., 13 A.D.2d 710, 214 N.Y.S.2d 115 [3].

■ We think the evidence showed that the type and condition of the test engine (No. 1024) was substantially similar to the accident engine (No. 1022). They were shown to be the same model and type of Baldwin locomotive and were purchased at about the same time. There was evidence from which it reasonably could have been found that they were in substantially the same condition. Ralph Miller, road foreman of engines for defendant railroad, testified that the brakes on the test engine were in "perfect condition." He further stated that the brakes on each of the company's engines are checked in all respects, and any defects corrected, at the end of each trip. That tends to prove that such a check was made on the accident engine after it returned to Malden, Missouri, the night before the collision. Mr. Bergman

also testified that "there would be no difference" in the condition of the brakes on the two engines. The evidence heretofore stated would warrant a finding that the brakes on the accident engine were in good condition at the time of the collision. Our factual statement will also indicate that the general conditions at the time of the tests were substantially similar to the conditions at the time of the collision. While it was shown to have been a much colder day when the tests were made, there was evidence to the effect that heat increases the stopping distance of a train and hence plaintiff could not have been prejudiced by that difference. We rule that the trial court did not abuse its discretion in admitting evidence of the tests herein described. We have carefully examined the cases cited by plaintiff and find that they involve different factual situations and do not support a conclusion different from that we have reached.

The two men in the cab of the accident engine expressed the opinion that the train was traveling at a speed of from 30 to 32 m.p.h. as it approached the crossing. The train stopped in 395 feet after application of the emergency brake. When the tests were made the train, being operated at a speed of 30 m.p.h., came to a stop 497 feet after the emergency brake was applied. Plaintiff has briefed the point that the court erred in permitting Mr. Kifer to testify (on the basis of that evidence) to the conclusion that "this train was not traveling thirty miles an hour, that it had to be somewhat less than thirty to come up with this stopping distance of approximately three hundred and ninety-five feet." Plaintiff also contends that the court erred in admitting evidence of tests showing the slackening capacity of the test engine at a speed of 27 m.p.h. since the only testimony concerning the speed of the train was that it was traveling from 30 to 32 m.p.h.

■■ We have concluded that we need not rule those contentions on the merits. This for the reason that the evidence was beneficial to plaintiff. For an error to

require a reversal it must have been prejudicial to the complaining party. Smith v. St. Louis Public Service Co., Mo., 277 S.W.2d 498. The instant evidence tended to prove that the accident train was traveling at a speed of 27 m.p.h. The slackening distance at that speed would be less than at a speed of 30 m.p.h. The test evidence showed that at 27 m.p.h. the train began to slacken speed at 178 feet after the emergency application, while at 30 m.p.h. the train traveled more than 220 feet before any slackening occurred. Therefore, even if we assume that the evidence complained of was erroneously admitted, since it was actually beneficial to plaintiff it could not have been prejudicial and its admission would not require a reversal of the judgment.

■ While it is not assigned as a specific point relied on, plaintiff frequently makes the statement in his brief that since the stopping distance of the test train at 30 m.p.h. was 497 feet, 102 feet more than the stopping distance of the accident train, "the test was obviously no good." We do not agree with that conclusion. It is based on the absolute assumption that the accident train was traveling at a speed of 30 m.p.h. While that was the opinion testimony of the two witnesses in the cab of the engine, the railroad company is not conclusively bound by those estimates. Rudin v. Moss, Mo., 349 S.W.2d 893 [2]. It has been said that such "statements pertaining to speeds or distances obviously were not positive declarations of fact but were so phrased and qualified that they clearly were intended to be, and indeed were, nothing more than inexact estimates with all of the frailties inherent in that character of statement." Jones v. Fritz, Mo.App., 353 S.W.2d 393, 395. Obviously, since there was no speedometer on the engine Mr. Johnson and Mr. Venable would not necessarily have been able to state the exact speed of the train. Therefore, the positive conclusion that the tests were inaccurate and invalid is not warranted. The jury could form its own conclusions from all the evidence in making its findings.

The defendant railroad company has also briefed the contention that plaintiff failed to make a submissible case, but the conclusion we have reached makes it unnecessary to consider that point.

The judgment is affirmed.

HENLEY, P. J., and SEILER, J., concur.

STORCKMAN, J., not sitting when cause was submitted.