**In re the MARRIAGE OF Beth Andrews GARDNER and John David Gardner.**

**Beth Andrews GARDNER, Respondent,**

v.

**John David GARDNER, Appellant.**

Nos. 21808, 22070.

Missouri Court of Appeals,
Southern District,
Division One.

June 12, 1998.

Motion for Rehearing and Transfer to Supreme Court Denied July 20, 1998.

Application for Transfer Denied
Aug. 25, 1998.

John L. Oliver, Jr., Joanna C. Fryer, Oliver, Oliver & Waltz, P.C., Cape Girardeau, for appellant.

King E. Sidwell, Blanton, Rice, Sidwell & Nickell, L.L.C., Sikeston, for respondent.

CROW, Judge.

These consolidated appeals arise from the second round of a dissolution of marriage fight. The first round ended with this court's opinion in *In re Marriage of Gardner*, 890 S.W.2d 303 (Mo.App. S.D.1994).[1] It should be read as a preface to the present opinion.

The present appeals, like the first appeal, are brought by John David Gardner. Seven of the eight points relied on in his brief pertain to appeal 21808. That appeal attacks a "Judgment and Order on Master's Report."

The other point relied on in John's[2] brief pertains to appeal 22070. That appeal attacks a judgment entered six months after the judgment identified in the preceding paragraph. The judgment assailed in appeal 22070 commands John to pay Beth and her lawyers $7,500 for attorney fees and expenses in responding to appeal 21808.

This opinion addresses the appeals separately, beginning with 21808. The issues raised by John in that appeal concern two provisions of the dissolution decree. The first provision is a paragraph numbered "(E)(5)" in the decree. It awards Beth:

"A fifty percent interest in the John D. Gardner Pension & Profit Sharing Trust as of December 31, 1991 subject to a Qualified Domestic Relation [sic] Order which is attached hereto and made a part of this decree. [$]216,252.50"

This opinion henceforth refers to the above award as "the E5 award."

The second provision appears later in the decree. It reads:

"In order to balance equities in the division of the property, [John] is ordered to pay to [Beth] the sum of $225,000, with $75,000 to be due October 20, 1993 and the balance to be paid in ten equal annual installments, together with 7.5% interest, with full prepayment privilege, with the first payment due and payable July 1, 1994 and each payment thereafter due on July 1 of each year. If any payment is delinquent for ten (10) days the entire sum shall immediately become due and payable. This debt shall be a lien upon all real estate owned by [John] until paid. [$]225,000.00"

This opinion henceforth refers to the above award as "the $225,000 award."

Four of John's assignments of error complain about rulings by the trial court regarding the E5 award. Discussion of those complaints requires an account of certain pertinent facts.

As explained in this court's opinion in the first appeal, John is a dentist; he is sole shareholder in the professional corporation through which he practices that profession. 890 S.W.2d at 305. We glean from the record that the name of the corporation is: John D. Gardner, D.D.S., P.C. This opinion henceforth refers to that entity as "JDGDDSPC."

The dissolution decree contains a finding that JDGDDSPC has a pension and profit sharing trust (inferably the "John D. Gardner Pension & Profit Sharing Trust" referred to in the E5 award). John's brief refers to that entity as "the Plan." For convenience, so shall this opinion.

The parties' briefs identify John as administrator of the Plan.[3]

Although the E5 award recites that a "Qualified Domestic Relation [sic] Order" is attached to the dissolution decree and made part thereof, no such order was signed by the trial court prior to or contemporaneously with entry of the decree.[4] The consequences of that omission will become evident later.

---

1. This court's mandate was issued January 27, 1995, following denial by the Supreme Court of Missouri of an application to transfer by John David Gardner.

2. For brevity and clarity, this opinion henceforth refers to the parties by their respective forenames. No disrespect is intended.

3. Where a statement of fact in one party's brief is conceded to be true in the adversary's brief, we may consider it as though it appears in the record. *State ex rel. Missouri Highway and Transportation Commission v. Sweeney*, 933 S.W.2d 908, 910[1] (Mo.App. S.D.1996).

4. The dissolution decree was entered September 21, 1993. The judge who entered it is not the judge who entered the judgments from which the present appeals are taken.

On May 24, 1995, some four months after this court's mandate in the first appeal,[5] Beth filed a "Motion for Contempt" in the trial court. The motion averred, *inter alia,* that although the dissolution decree had become final, John had failed and refused to deliver to Beth certain property awarded her including:

"Fifty (50) percent interest in the John D. Gardner Pension & Profit Sharing Trust as of December 31, 1991, subject to a Qualified Domestic Relation [sic] Order[.]"

As best this court can determine from the amorphous record,[6] the next significant event regarding the E5 award occurred March 1, 1996, when the trial court signed a six-page document denominated "Qualified Domestic Relations Order." This opinion henceforth refers to that document as "QDRO–1."

QDRO–1 stated, *inter alia,* that Beth was to receive her $216,252.50 share of the Plan "plus accrued earnings and/or losses from December 31, 1991."

The record indicates Beth's lawyer sent John (administrator of the Plan) a copy of QDRO–1.

At John's request, Martin Seiler, a Tennessee lawyer specializing "in the area of employee benefits," reviewed QDRO–1.

In a letter to Beth's lawyer dated May 16, 1996, Seiler proposed certain "language changes" for QDRO–1. Seiler's letter also said:

"My major problem is that [QDRO–1] grants your client a five year retroactive effect. I believe the whole purpose of the 18 month language [7] is to protect the trust from such long term retroactive requirements. Please remember that the trust is a separate entity and as a matter of federal law could not take knowledge of the divorce terms until it was notified by the March 1996 order."

On a date this court cannot locate in the record, but evidently prior to June 7, 1996, Beth filed in the trial court a "Motion for Preliminary Injunction." The motion averred, *inter alia,* that John had refused to segregate Beth's share in the Plan into a separate account and that without a "neutral third party" to administer said funds, Beth's share "is in danger of being dissipated."

On June 7, 1996, the trial court signed an "Order upon Stipulation of Parties." The order commanded John, as administrator of the Plan, to deposit in the registry of the court "actual possession and control" of certain documents representing ownership of funds "which comprise the segregated amount of $216,252.50" constituting Beth's share of the Plan. The order recited its purpose was to "preserve the status quo" pending determination of the disposition of assets of the Plan by the trial court or another court of competent jurisdiction. The order further provided that one issue to be determined by such court was "whether or not the corpus of the fund affected by [QDRO–1] is to be determined as of December 31, 1991 or some other date." [8]

On August 15, 1996, the trial court entered an "Order Staying Execution Sale [9] for One

---

5. Footnote 1, *supra.*

6. The record handed this court consists of: a transcript of a hearing before a special master September 26, 1996; a transcript of a hearing before the trial court June 6, 1997; a 163–page legal file; a two-page supplemental legal file; a 161–page volume denominated "Exhibits" containing 34 documents including a docket sheet, summonses to garnishees, and answers to interrogatories (documents normally found in a legal file); a 106–page volume denominated "Appellee's Exhibits" containing 19 documents including the dissolution decree, an appeal bond, and a motion for preliminary injunction (documents normally found in a legal file).

7. This court gleans from John's brief that the "18 month language" mentioned in Seiler's letter is the 18–month period described in 29 U.S.C. § 1056(d)(3)(H)(v), discussed later in this opinion.

8. The June 7, 1996, order was signed by a judge other than the judge who entered the judgments from which the present appeals are taken. This court deduces from the docket sheet that Beth's request for injunctive relief was assigned to the judge who entered the June 7, 1996, order, while all other issues remained pending before the judge who ultimately entered the judgments under review here. No issue about that procedure is raised by John.

9. An execution sale had been set for August 15, 1996. This opinion has not yet mentioned that circumstance because it is not pertinent to the

Month and Consolidating Issues for Submission to Special Master."[10] The order provided, *inter alia,* that John agreed "to submit to determination by special master any and all outstanding issues by and between John . . . [JDGDDSPC], John . . . as Trustee for the John D. Gardner Trust [JDGDDSPC] Pension Trust and [JDGDDSPC] Profit Sharing Trust as those issues . . . may exist relating to Beth. . . ."

The August 15, 1996, order appointed "Honorable Paul McGhee" special master and commanded the parties to submit "all issues in controversy between them" to the master for determination. Those issues included the "qualified status of the domestic relations order" and "the issues for approval and qualification of the domestic relations order as presented to [a United States District Court[11]]."

Special Master McGhee[12] conducted a hearing September 26, 1996. Two witnesses testified: lawyer Seiler (mentioned earlier in this opinion) and Susan Callison, a Tennessee lawyer specializing in "taxation . . . and employee benefits."

Seiler avowed the Plan is a defined contribution plan, not a defined benefit plan. Consistent with his letter of May 16, 1996, to Beth's lawyer, Seiler asserted the "primary problem" with QDRO–1 was "the issue of earnings and interest." The problem exists, said Seiler, because the E5 award valued Beth's interest in the Plan at $216,252.50 as of December 31, 1991, the decree was entered September 21, 1993, and QDRO–1 was signed March 1, 1996. As we have seen, QDRO–1 states Beth's share in the Plan is the $216,252.50 in the E5 award "plus accrued earnings and/or losses from December 31, 1991."

According to Seiler, QDRO–1 compels the Plan administrator to retroactively calculate the earnings and losses on Beth's $216,252.50 share after December 31, 1991. Such a task, said Seiler, requires extraction of data from the Plan's financial records for 1992 through 1995. Seiler's belief, as we comprehend it, is that crediting Beth with those earnings (or losses) after a delay of that length would violate the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended. That notion is carried forward in John's third point on appeal, addressed later.

Lawyer Callison testified that QDRO–1 meets the ERISA requirements for a qualified domestic relations order and its validity is not impaired by the lapse of time between the valuation date of Beth's share in the Plan and the date QDRO–1 was signed. According to Callison, retroactive calculation for allocation of earnings among participants in retirement plans is "done all the time."

On October 29, 1996, the Master filed his report in the trial court. Regarding QDRO–1, the Master concluded: (a) Beth became entitled to her share in the Plan as of December 31, 1991, hence she is entitled to all earnings on her share from and after that date; (b) John's expert is able to make those calculations; (c) QDRO–1 can be modified to meet Seiler's requirements and, when so modified, will be a qualified domestic relations order.

On June 6, 1997, the trial court held a hearing on whether it should adopt the Master's report. No one testified; the proceeding consisted of lawyers' arguments.

On June 26, 1997, the trial court filed a judgment confirming the Master's report. That is the judgment from which John brings appeal 21808. The judgment provides, *inter alia,* that Beth's share in the Plan is ordered

complaints of error addressed first. Relevant details about the proposed sale are set forth later.

**10.** The copy of the August 15, 1996, order in the record furnished us is not signed by the trial court and is not stamped filed by the circuit clerk. However, as we comprehend the parties' briefs, they agree the order was entered.

**11.** The statement of facts in John's brief does not enlighten us about the litigation in that court.

Neither does the statement of facts in Beth's brief.

**12.** John's brief refers to McGhee as "Senior Judge Paul McGhee." Beth's brief adopts that designation. This court takes judicial notice that McGhee was formerly an associate circuit judge in Stoddard County. Official Manual, State of Missouri 1993–1994, p. 282. This opinion henceforth refers to him as "the Master."

segregated as of December 31, 1991, and that she shall receive earnings (less losses) on her share from that date.

Attached to the judgment is a four-page document denominated "Amended Qualified Domestic Relations Order" signed by the trial court June 24, 1997. This opinion henceforth refers to that document as "QDRO–2."

The judgment contains a finding that QDRO–2 is deemed "qualified" under ERISA. Pertinent ERISA provisions regarding qualified domestic relations orders are set forth later when this opinion addresses John's third point.

■ Before reaching the third point, we confront a threshold issue—John's eighth point. It avers:

"The trial court erred in adopting the report of the ... Master because it misapplied the law in determining that it could properly adopt the report in that Rule 68.01(d) requires that the ... Master 'shall take and subscribe an oath' before hearing any testimony and the ... Master in this instance failed to take such an oath."

At oral argument in this court, John's lawyer conceded this issue was not raised in the trial court.

The only case cited by John in support of his eighth point is *R.J. v. S.L.J.*, 732 S.W.2d 574 (Mo.App. E.D.1987). There, in an action for dissolution of marriage, the trial court appointed a special master to "hear custody and visitation matters" regarding the parties' children. *Id.* at 575. After conducting hearings, the master filed a report unfavorable to the father. *Id.* The father lodged objections to the report in the trial court. *Id.* One objection was that Rule 68.01(d) [13] had been violated. *Id.*

The trial court in *R.J.* adopted the report. *Id.* at 576. At the time the court did so, no transcript of the master's hearing was on file. *Id.*

The appellate court in *R.J.* held the trial court erred in adopting the report when no transcript of the master's hearing had been filed. *Id.* at [1]. The appellate court further held the trial court erred in adopting the report in that the master had not taken the oath required by Rule 68.01(d) and the parties had not waived the requirement. *Id.* at 576–77[4].

*R.J.* differs from the instant case in two respects.

First, the docket sheet in the instant case shows that the court reporter, on October 30, 1996, filed in the trial court a transcript of the Master's hearing of September 26, 1996. Thus, unlike the trial court in *R.J.*, the trial court in the instant case had access to a transcript of the Master's hearing for almost eight months before the trial court entered judgment confirming the Master's report.

Second, unlike the father in *R.J.*, John never complained to the trial court in the instant case that the Master failed to comply with Rule 68.01(d). At the hearing in the trial court June 6, 1997 (mentioned earlier), John's lawyer voiced a number of objections to the Master's report, but uttered no protest that the Master failed to take and subscribe the oath required by Rule 68.01(d).

In *Rickman v. White*, 266 S.W. 997 (Mo. App.1924), the parties agreed to submit a dispute to arbitration. On appeal from a judgment enforcing the arbitrators' award, the defendant complained that neither the arbitrators nor witnesses were sworn. *Id.* The appellate court held the law requires arbitrators and witnesses to be sworn. *Id.* at 998[2]. However, added the court:

"[T]hat requirement may be waived, and a party who, with knowledge of the facts, proceeds without objection or request that oaths be administered, waives it." *Id.*

In the instant case, John appeared in person and with his lawyer at the Master's hearing. Neither John nor his lawyer registered any objection about noncompliance

---

**13.** Rule 68.01(d), Missouri Rules of Civil Procedure (1998), reads the same today as it did when *R.J.* was decided. It provides:

"Before proceeding to hear any testimony in the action, a master shall take and subscribe an oath, before some officer duly authorized to administer an oath, faithfully to hear and examine the matters at issue and to make a just, impartial and true report."

with Rule 68.01(d) when the Master commenced the hearing, or later when lawyers Seiler and Callison testified. Furthermore, John filed no such objection in the trial court during the eight-month interval between the Master's hearing and the trial court's hearing on whether the Master's report should be confirmed.[14] Finally, as underscored earlier, John voiced no such objection during the latter hearing.

We hold John's eighth point is governed by *Rickman*, 266 S.W. 997. Accordingly, we find John waived the Master's noncompliance with Rule 68.01(d).

Additionally, we note *R.J.*, 732 S.W.2d 574, did not hold the master's failure to comply with Rule 68.01(d) deprived the trial court of jurisdiction to approve the master's report. Instead, *R.J.* held only that it was error to adopt the report when the parties had not waived the requirement. *Id.* at 576–77[4]. Inasmuch as we have concluded that John did waive the requirement, we hold *R.J.* does not compel reversal here. John's eighth point is denied.

That brings us to John's third point, which reads:

"The trial court erred in calculating the amount of pension funds due [Beth] because its allocation of interest and earnings to [her] on her share of the funds retroactive to December 31, 1991 and its award of interest and earnings for the Plan funds as a whole from June 7, 1996 forward rather than awarding actual earnings on $216,-252.50 which was segregated at the request of [Beth] and pursuant to court order as well as its considered [sic] of [Beth's] Exhibit 'H' was contrary to the law and a misapplication of the law in that 29 U.S.C. § 1056 prohibits retroactive application of a qualified domestic relations order beyond an eighteen month period and the trial court's order requires approximately five year retroactive application, 29 U.S.C. §§ 1104 and 1056 require a plan administrator to pay actual interest and earnings on segregated accounts and 29 U.S.C. § 1104(1) suggests that when a beneficiary exercises control over her portion of plan funds she must bear any losses resulting from this control, and Exhibit 'H' was neither offered nor entered into evidence."

■ After diligently studying this bewildering point and the argument following it, we have deduced that the point attempts to charge the trial court with three errors. Before setting forth our understanding of the trio, we note that a point relied on should assert a single claim of error, not multiple claims. *Thummel v. King*, 570 S.W.2d 679, 688[14] (Mo. banc 1978); *McCormack v. Maplewood–Richmond Heights School District Board of Education*, 935 S.W.2d 703, 707[5] (Mo.App. E.D.1996).

■ The first alleged error in John's third point, as we decipher it, is that the trial court violated certain ERISA provisions when it undertook to award Beth the earnings on her $216,252.50 share of the Plan from and after December 31, 1991.

The ERISA provision cited by John in support of the first alleged error in his third point is 29 U.S.C. § 1056(d).[15] For brevity, this opinion henceforth omits the preface "29 U.S.C." when referring to § 1056.

§ 1056(d)(3) permits payment of benefits by a pension plan to persons other than participants if certain requirements are met. In setting forth the requirements, § 1056(d)(3) uses the term "domestic relations order"—defined in § 1056(d)(3)(B)(ii)—and the term "qualified domestic relations order"—defined in § 1056(d)(3)(B)(i). Additionally, § 1056(d)(3) uses the term "alternate payee"—defined in § 1056(d)(3)(K).

The procedure to be followed by the administrator of a pension plan upon receiving a domestic relations order is spelled out in § 1056(d)(3)(G)(i)(II), which reads:

---

14. Rule 68.01(g)(2) grants a party thirty days after service of notice of the filing of a master's report to file written objections. The timely objections filed by John did not mention Rule 68.01(d).

15. The version of U.S.C. in force when the trial court entered the judgment appealed from in appeal 21808 is the version that preceded the 1997 amendments.

"within a reasonable period after receipt of such order, the plan administrator shall determine whether such order is a qualified domestic relations order and notify the participant and each alternate payee of such determination."

§ 1056(d)(3)(H) provides:

"(i) During any period in which the issue of whether a domestic relations order is a qualified domestic relations order is being determined (by the plan administrator, by a court of competent jurisdiction, or otherwise), the plan administrator shall separately account for the amounts (hereinafter in this subparagraph referred to as the 'segregated amounts') which would have been payable to the alternate payee during such period if the order had been determined to be a qualified domestic relations order.

(ii) If within the 18–month period described in clause (v) the order (or modification thereof) is determined to be a qualified domestic relations order, the plan administrator shall pay the segregated amounts (including any interest thereon) to the person or persons entitled thereto.

(iii) If within [the] 18–month period described in clause (v)

(I) it is determined that the order is not a qualified domestic relations order, or

(II) the issue as to whether such order is a qualified domestic relations order is not resolved,

then the plan administrator shall pay the segregated amounts (including any interest thereon) to the person or persons who would have been entitled to such amounts if there had been no order.

(iv) Any determination that an order is a qualified domestic relations order which is made after the close of the 18–month period described in clause (v) shall be applied prospectively only.

(v) For purposes of this subparagraph, the 18–month period described in this clause is the 18–month period beginning with the date on which the first payment would be required to be made under the domestic relations order."

John's hypothesis, as we cull it from the argument in his brief, is that the term "payment" in § 1056(d)(3)(H)(v) encompasses the accounting procedure that occurs under § 1056(d)(3)(H)(i) when the plan administrator identifies the amounts which would have been payable to the alternate payee during the period in which the issue of whether the domestic relations order is a qualified domestic relations order is being determined. Those amounts, referred to as the "segregated amounts," are to ultimately be paid to the alternate payee if, within the 18–month period specified in § 1056(d)(3)(H)(v), the domestic relations order is determined to be a qualified domestic relations order. Under § 1056(d)(3)(H)(v), the 18–month period begins on the date the first payment would be required to be made by the domestic relations order.

As we grasp John's argument, he maintains that awarding Beth the earnings on her $216,252.50 share of the Plan from and after December 31, 1991, requires "funds" to be retroactively transferred to Beth's account starting December 31, 1991, and this violates ERISA's 18–month limit on "retroactive application."

If we are correct in our understanding of John's argument, we find it meritless.

The purpose of the provisions relied on by John appears to be to protect a pension plan and its administrator by allowing the administrator to specifically account for the amounts in dispute and withhold payment of them to anyone during an 18–month period beginning on the date the first payment would be due under the domestic relations order. During this 18–month period, the issue of whether the domestic relations order is a qualified domestic relations order will—hopefully—be resolved. If the issue is resolved favorably to the alternate payee, the plan administrator pays the "segregated amounts" to the alternate payee. If the issue is not resolved during the 18–month period, the plan administrator is thereafter allowed to pay the "segregated amounts" to the person who would have been entitled to them had there been no domestic relations order.

John asserts—and we agree—that a plan administrator's obligation to an alternate payee does not arise until the plan receives a domestic relations order. In the instant case, no domestic relations order existed until the trial court signed QDRO–1 on March 1, 1996. Consequently, no payment could have been "due" from the Plan to Beth under QDRO–1 before that date. It follows that here, the 18–month period in § 1056(d)(3)(H)(v) did not commence until some date after March 1, 1996—whatever date John, as administrator of the Plan, received QDRO–1.

When that occurred, the ERISA provisions quoted above required John, as administrator of the Plan, to separately account for the sum due Beth and preserve the "segregated amounts" for 18 months if it took that long to determine whether QDRO–1 was a qualified domestic relations order. John cites no evidence that the earnings on Beth's share of the Plan after December 31, 1991, could not have been calculated during that 18–month period. Furthermore, he cites no authority for the proposition that calculating them and accounting for them in Beth's "segregated" share would have constituted a "payment" to her under ERISA.

We glean from the record that John was not entitled to any payment from the Plan on December 31, 1991, and did not become entitled to any payment from it prior to the June 26, 1997, judgment. Therefore, it was unnecessary for the Plan to withhold any payment from John after receiving QDRO–1. All of the assets of the Plan remained invested up to the time of the hearing in the trial court June 6, 1997. Furthermore, inasmuch as the Plan paid John nothing after December 31, 1991, calculating the earnings on Beth's $216,252.50 share of the Plan and crediting them to her in the accounting required by § 1056(d)(3)(H)(i) would not result in her receiving an award of earnings already paid by the Plan to John.

■ On appeal, a trial court's action is presumed correct and the burden is on the appellant to establish that the action was error. *Linzenni v. Hoffman*, 937 S.W.2d 723, 725[3] (Mo. banc 1997). John cites nothing that supports the first theory of error in

his third point. After sedulous study of the ERISA provisions on which John bases the theory, we conclude they do not support it. It is denied.

■ The second alleged error in John's third point is that the trial court wrongly calculated the amount due Beth from the Plan in that the court awarded her, in John's words, "interest and earnings for the Plan funds as a whole from June 7, 1996 forward rather than awarding actual earnings on $216,252.50 which was segregated at the request of [Beth] and pursuant to court order."

As reported earlier, the trial court signed an order June 7, 1996, commanding John, as administrator of the Plan, to deposit in the registry of the court certain documents evidencing ownership of funds comprising "the segregated amount of $216,252.50." As we understand the record, John thereafter delivered to the circuit clerk certificates evidencing ownership of three funds aggregating $216,252.50. This opinion henceforth refers to those certificates as "the $216,252.50 certificates." The $216,252.50 certificates identify their owner as the JDGDDSPC "Pension and Profit Sharing Trust."

John's brief argues that the earnings on the funds represented by the $216,252.50 certificates "differ from the unencumbered pension plan funds." According to John, the trial court's order "fails to adjust for this difference, and requires the Plan to distribute interest and earnings to [Beth] as if these funds had never been segregated."

John's brief yields no clue about the extent of the alleged "difference" and supplies no hint as to where we can find that information in the record.

Rule 84.04(c) requires the statement of facts in an appellant's brief to be a fair and concise statement of the facts relevant to the questions presented for determination. The purpose of the rule is to ensure that the statement of facts affords an immediate, accurate, complete and unbiased understanding of the facts of the case. *Walker v. Thompson*, 338 S.W.2d 114, 118[9] (Mo.1960). Compliance with the rule facilitates the work of the appellate court and benefits the litigants

in that the issues may be properly presented and considered. *Id.*

The statement of facts in John's brief does not set forth the earnings on the funds represented by the $216,252.50 certificates from and after the date the certificates were delivered to the circuit clerk, nor does the statement of facts set forth the earnings on the Plan's other assets from and after that date. Consequently, we cannot determine, from the statement of facts, whether the earnings on the former were more or less than the earnings on the latter. Furthermore, the statement of facts furnishes no inkling as to where we can find that information in the record (if indeed it is there).

The argument in John's brief, like the statement of facts, does not set forth the earnings on the funds represented by the $216,252.50 certificates from and after the date the certificates were delivered to the circuit clerk, nor does the argument set forth the earnings on the Plan's other assets from and after that date. Additionally, the argument surrenders no hint as to where we can find that information in the record.

Rule 84.04(h) requires that all statements of fact and argument in an appellant's brief have specific page references to the legal file or transcript. In *State ex rel. Webster v. Missouri Resource Recovery, Inc.*, 825 S.W.2d 916, 936 (Mo.App. S.D.1992), the argument on a point in a brief furnished no citation to the record where evidence might be found to support the argument. This court said:

> "Because of the complexity of this case and the number of issues raised on appeal, it was imperative that we have an immediate, accurate, complete, and unbiased understanding of the facts relevant to those issues. This we do not find in the plaintiffs' brief as it relates to the foregoing issues."

*Id.* at 937. Because the brief in that case furnished no citation to the record supporting the factual averments on which the point was based, this court held the point was not preserved for review. *Id.* at 936–37[19].

The same treatment is warranted here. As the length of this opinion demonstrates, this case presents a multitude of issues, some complex. We have endeavored to compile and narrate the evidence pertinent to the assignments of error addressed so far. However, we decline to seine the record for evidence to support the second claim of error in John's third point. We hold it is not preserved for review.

■ Before leaving it, we point out that for error to require reversal, it must have been prejudicial to the complaining party. *Wilcox v. St. Louis–Southwestern Railroad Co.*, 418 S.W.2d 15, 19–20[3] (Mo.1967). Error without prejudice is no ground for reversal. *Neavill v. Klemp*, 427 S.W.2d 446, 448[9] (Mo.1968).

Absent evidence about the earnings on the funds represented by the $216,252.50 certificates and the earnings on the Plan's other assets, there is no showing that John was harmed by the second alleged error in his *third point.*

■ The third—and final—alleged error in John's third point is that the trial court wrongly considered Beth's Exhibit H. According to John, Exhibit H was not received in evidence at the June 6, 1997, hearing.

The record furnished us includes a three-page document marked Exhibit H. It is a memorandum dated March 29, 1997, prepared by BMC Consultants, Inc. The stationery indicates that entity is a provider of retirement plan administration services. As we comprehend Exhibit H, it sets forth a series of calculations showing Beth's share of the Plan's earnings from December 31, 1991, through December 31, 1996.

John's brief does not reveal the page of the transcript of the June 6, 1997, hearing at which the admissibility of Exhibit H is addressed. On our own, we have found the pages where Exhibit H is mentioned. Those pages show Beth's lawyer presented Exhibit H to the court. Thereupon, John's lawyer said: "There were two BMC calculations. One of them was incorrect. I just wanted to make sure [Beth's lawyer] was presenting the correct one to you."

Beth's lawyer then asked the trial court to sign a domestic relations order using the calculations in Exhibit H. John's lawyer registered no objection to that procedure.

■ The trial court could have readily inferred from that colloquy that John had no objection to the court's use of Exhibit H in determining the earnings on Beth's share of the Plan since December 31, 1991. A party cannot complain on appeal about an alleged error in which that party joined or acquiesced at trial. *In re Marriage of Glueck*, 913 S.W.2d 951, 956[10] (Mo.App. E.D.1996). Accordingly, in using Exhibit H to determine the earnings on Beth's share of the Plan after December 31, 1991, the trial court committed no error about which John can complain in this court.

Furthermore, John makes no attempt to show that any calculation in Exhibit H is erroneous. As observed earlier, error without prejudice is no ground for reversal. *Neavill*, 427 S.W.2d at 448[9]. The third claim of error in John's third point is denied.

■ John's fourth point avers the trial court erred in awarding Beth earnings on her share of the Plan "retroactive to December 31, 1991," in that the E5 award in the dissolution decree did not purport to award Beth earnings, but only a fifty percent interest in the Plan which, as of December 31, 1991, the trial court valued at $216,252.50. John cites § 452.330.5, RSMo 1994, which pertains to disposition of property in a proceeding for dissolution of marriage. The statute reads:

"The court's order as it affects distribution of marital property shall be a final order not subject to modification; provided, however, that orders intended to be qualified domestic relations orders affecting pension, profit sharing and stock bonus plans pursuant to the U.S. Internal Revenue Code shall be modifiable only for the purpose of establishing or maintaining the order as a qualified domestic relations order or to revise or conform its terms so as to effectuate the expressed intent of [the] order."

The E5 award in the dissolution decree is silent regarding the earnings on Beth's $216,252.50 share of the Plan. As noted earlier, the decree was entered September 21, 1993, twenty-one months after the date used by the trial court to value Beth's share (December 31, 1991). Obviously, at the time the

decree was entered, earnings (or losses) on Beth's share would have accrued since the valuation date.

We gather from the transcript of the Master's hearing (September 26, 1996) that John's share of the Plan, combined with Beth's share, amounted to 97.5 percent of the Plan's assets. Obviously, if the earnings on Beth's share since December 31, 1991, were not credited to her, John's share would be credited with them.

As reported earlier in this opinion, QDRO–1, signed by the trial court March 1, 1996 (twenty-nine months after entry of the dissolution decree), provided that Beth was to receive, as her share of the Plan, $216,252.50 "plus accrued earnings and/or losses from December 31, 1991." The judgment entered June 26, 1997, contained a similar provision.

QDRO–2, signed by the trial court June 24, 1997 (two days before the June 26, 1997, judgment), awarded Beth, from John's beneficial interest in the Plan, $339,376.89. QDRO–2 provided that this sum shall be treated as Beth's share as of December 31, 1995. We infer this sum is the total of Beth's $216,252.50 share of the Plan as of December 31, 1991, plus the earnings (less losses) on her share from that date to December 31, 1995. QDRO–2 further provided that Beth's share shall be increased (or decreased) by treating Beth as a participant for all purposes including allocation of earnings and losses for each full plan year in which distribution to her is not made.

John maintains that because the E5 award in the dissolution decree makes no reference to earnings on Beth's share of the Plan, the provisions regarding earnings in QDRO–1, QDRO–2 and the June 26, 1997, judgment constitute an "impermissible modification" of the E5 award in violation of § 452.330.5 (quoted earlier). According to John, the provisions regarding earnings do not fall within either of the exceptions in the statute, i.e., modifications "for the purpose of establishing or maintaining the order as a qualified domestic relations order or to revise or conform its terms so as to effectuate the expressed intent of [the] order."

We disagree. We hold QDRO–1, QDRO–2 and the June 26, 1997, judgment merely confirm what Beth was awarded in the E5 award, and that QDRO–1 and QDRO–2 were entered for the purpose of enforcing the E5 award. *See: Seal v. Raw*, 954 S.W.2d 681, 682–83[1] (Mo.App. W.D.1997).

As observed earlier, the dissolution decree was entered twenty-one months after the date used by the trial court in valuing Beth's fifty percent share in the Plan at $216,252.50. Because the Plan's assets were generating earnings (or losses) from and after the valuation date, it would have been virtually impossible for the trial court, in entering the decree September 21, 1993, to include therein the precise dollar value of Beth's fifty percent share at the instant the court signed the decree.

John's theory appears to be that because the E5 award did not specifically provide that Beth was to receive the earnings (or losses) generated by her share in the Plan after December 31, 1991, the decree implicitly awarded such earnings (or losses) to him.

That is nonsense. The effect of such a construction would be to award one party the earnings (or losses) generated by an adverse party's assets. John cites no authority supporting such an interpretation. His fourth point is denied.

■ John's fifth point avers the trial court erred "in excluding from the expenses to be allocated to [Beth's] share of the pension funds expenses in any way relating to the determination of the status or the administration of the domestic relations order."

Nowhere in the point or the argument following it does John identify the order about which he complains.

We divine from a reference to the legal file in the statement of facts in John's brief that the order he seeks to attack is paragraph "D" of the June 26, 1997, judgment. It orders that

"[Beth] pay a pro rata share of any plan expenses from and after March 1, 1996, provided that no expenses (including but not limited to attorneys fees and expenses, court costs and expert witness fees and expenses) in any way relating to the deter-

mination of the status of or the administration of [QDRO–2] attached hereto or the March 1, 1996 Domestic Relations Order of this Court shall be charged directly or indirectly against [Beth.]"

As we have seen, calculation of the earnings on Beth's share of the Plan from and after December 31, 1991, was done by BMC Consultants, Inc. Additionally, lawyer Seiler, at John's request, reviewed QDRO–1 and testified about his conclusions regarding it at the Master's hearing. We infer the expenses for those services, and perhaps others, are the expenses toward which John's fifth point is directed.

John's brief tells us there is no reported case addressing the issue of whether the share of an alternate payee in a pension plan can be charged with expenses incurred in determining whether a domestic relations order is a qualified domestic relations order. According to John, "the only existing authority" on that issue is an opinion letter of the Department of Labor denominated "Opinion 94–32A," dated August 4, 1994. This opinion henceforth refers to that document as "Opinion 94–32A."

Lawyer Seiler referred to a segment of Opinion 94–32A during his testimony at the Master's hearing. That segment reads:

"[I]t is the view of the Department that imposing a separate fee or cost on a participant or alternate payee (either directly or as a charge against a plan account) in connection with a determination or [sic] the status of a domestic relations order or administration of a QDRO would constitute an impermissible encumbrance on the exercise of the right of an alternate payee, under … ERISA, to receive benefits under a QDRO. Additionally, in the Department's view, because … ERISA imposes specific statutory duties on plan administrators regarding QDRO determinations and the administration of QDROs, reasonable administrative expenses thus incurred by the plan may not appropriately be allocated to the individual participants, and beneficiaries affected by the QDRO."

We detect no conflict between paragraph "D" of the June 26, 1997, judgment and the

excerpt from Opinion 94–32A. Paragraph "D" bars any charges against Beth, "directly or indirectly," for expenses incurred in determining whether QDRO–1 or QDRO–2 was a qualified domestic relations order. That is consistent with Opinion 94–32A.

It must be remembered that at the time of the Master's hearing, John's share of the Plan, combined with Beth's share, amounted to 97.5 percent of the Plan's assets. Obviously, if John, in his role as Plan administrator, could charge Beth's share with expenses incurred by John individually in challenging QDRO–1 and QDRO–2, John individually, as one of the two holders of the 97.5 percent share, would benefit financially.

We do not imply the Plan may not pay, from its assets, the reasonable expenses of administering it. Such expenses are specifically authorized by 29 U.S.C. § 1103(c)(1) and 29 U.S.C. § 1104(a)(1)(A)(ii). Inasmuch as John's share of the Plan, combined with Beth's share, amounts to 97.5 percent of the Plan's assets, payment of reasonable expenses of administering the Plan from its assets will obviously have an adverse effect on the interests of both John and Beth until Beth ultimately obtains everything due her from the Plan (if she ever does).

However, reasonable expenses of administering the Plan do not include expenses incurred by John individually in an effort to benefit himself financially by defeating or delaying the E5 award.

If, when the Plan pays Beth the E5 award, she believes John, as Plan administrator, has improperly charged expenses against Plan assets that he should have paid personally, she can seek redress. As John points out, a plan administrator must "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries." 29 U.S.C. § 1104(a)(1). Consequently, if John wrongfully charges against Plan assets any expenses he should have paid personally, he is in violation of that statute.

Because we espy no conflict between paragraph "D" of the June 26, 1997, judgment and Opinion 94–32A, we find no merit in John's fifth point.

John's sixth point challenges paragraph "J" of the June 26, 1997, judgment. That paragraph reads:

" ... John ... shall not amend or alter or cause to be amended or altered that portion of the Corporate Benefits Inc. regional prototype basic plan documents with respect to distributions under domestic relations orders and interest accruals in the year of distribution and shall not permit or cause delay of distribution in any manner whatsoever, except for the required waiting periods under controlling law, but shall promptly cause distribution to be made as provided under the terms and provisions of the Regional Prototype Document Sponsored by Corporate Benefits, Inc., copyrighted January 1, 1990[.]"

■ John's sixth point:

"The trial court erred in ordering that the Plan administrator may not alter or amend the pension plan with respect to distributions under domestic relations orders and may not permit or cause delay of distribution in any manner whatsoever but must cause distribution to be made as provided under the terms and provisions of the Original [sic] Prototype Document sponsored by Corporate Benefits, Inc., copyrighted January 1, 1990, because this order misapplies the law, violates ERISA, and requires [John] to violate ERISA, 29 U.S.C. § 1104(1) [sic]. In that both the Plan as it existed at the time of the dissolution decree and as it existed on the date of the court order does not permit immediate distribution of pension funds to an alternate payee, and any distribution which is contrary to Plan documents, compels [John] as Plan administrator to violate his fiduciary duty under 29 U.S.C. § 1104(1) [sic], for the reason that the applicable plan is either the plan that was in place at the time of the decree of dissolution or the one in place at the time of the signing of [QDRO–2]."

We begin our effort to adjudicate this esoteric point with four observations.

First, we infer the point's reference to "29 U.S.C. § 1104(1)" was meant to be a reference to 29 U.S.C. § 1104(a)(1).

Second, we infer the point's reference to the "Original Prototype Document" was meant to be a reference to the "Regional Prototype Document" mentioned in paragraph "J" of the June 26, 1997, judgment (quoted earlier).

Third, if there is any clue in the statement of facts in John's brief or the argument following point six as to where the "Regional Prototype Document" appears in the record, the clue is too well concealed for us to detect it.

Fourth, we have examined the tables of contents of the two volumes of exhibits furnished us by the parties and have found no listing for the "Regional Prototype Document." All we can find is a listing in one of the tables for "Section 6.07 of the Plan procedures." Under that listing, we find a two-page document marked Exhibit W. Its relevance is explained later.

Because it appears the "Regional Prototype Document" referred to by the trial court in paragraph "J" of the June 26, 1997, judgment has not been filed with us, we assume the content of that document is favorable to the trial court's ruling and unfavorable to John. *Cf. In re Marriage of Gourley*, 811 S.W.2d 13, 16[3] n. 2 (Mo.App. S.D.1991).

One segment of the argument following John's sixth point, as we comprehend it, asserts that at the time the dissolution decree was entered (September 21, 1993), the Plan did not allow distribution to anyone until John's retirement. However, as we fathom the argument, some time after entry of the dissolution decree and before January 1, 1997, the Plan was amended to provide "for a lump sum distribution." According to John's argument, as we grasp it, the amendment mentioned in the preceding sentence remained in effect until January 1, 1997.

The only document we find in the record that appears to be a provision of the Plan pertinent to John's sixth point is Exhibit W, mentioned above. One passage therein reads:

"This Plan specifically permits distribution to an alternate payee under a qualified domestic relations order at any time, irrespective of whether the Participant has attained his earliest retirement age (as defined under Code § 414(p)) under the Plan. A distribution to an alternate payee prior to the Participant's attainment of earliest retirement age is available only if: (1) the order specifies distribution at that time or permits an agreement between the Plan and the alternate payee to authorize an earlier distribution; and (2) if the present value of the alternate payee's benefits under the Plan exceeds $3,500, and the order requires, the alternate payee consents to any distribution occurring prior to the Participant's attainment of earliest retirement age."

We surmise from the argument in John's brief that Exhibit W is the provision that allowed "lump sum distribution" to an alternate payee prior to John's attainment of retirement age—the provision that took effect after the date the dissolution decree was entered and remained in effect until January 1, 1997. An attentive reader will recall the trial court signed QDRO-1 on March 1, 1996, and John, as administrator of the Plan, evidently received QDRO-1 a few days later. Accordingly, we deduce Exhibit W was in effect when the Plan received QDRO-1. If that assumption be correct, at the time the Plan received QDRO-1, Beth, as an alternate payee, was entitled to a distribution even though John had not yet reached retirement age.

John concedes he can find no authority supporting his premise that Beth's right to an immediate distribution from the Plan at the time the Plan received QDRO-1 can be defeated by amending the Plan thereafter. The mischief that could result from such a holding is too obvious to require explanation. We decline to adopt such a rule.

Accordingly, we hold Beth's rights to receive distribution from the Plan are those she had at the time the Plan received QDRO-1. Having decided that, we conclude that any issue as to whether the trial court could properly prohibit John from amending the Plan after the Plan received QDRO-1 is moot, as any such amendment would not divest Beth of any right with which she was vested when the Plan received QDRO-1.

John's sixth point thus presents no basis for reversal.

■ We next consider John's first point, a task that requires an account of certain events not yet mentioned in this opinion. An alert reader will recognize that the events chronicled hereunder occurred during the same time frame as events already recounted.

On March 7, 1995, at the request of Beth's lawyer, the clerk of the trial court issued an execution against John. In aid of the execution and at the direction of Beth's lawyer, the sheriff issued a garnishment to First State Bank and Trust Company of Caruthersville, Missouri ("First State Bank"), attaching all assets of John in the possession or under the control of the garnishee.

On March 10, 1995, at the request of Beth's lawyer, a second execution was issued against John. This time, at the direction of Beth's lawyer, the sheriff issued a garnishment to First State Bank, attaching all assets of JDGDDSPC in the possession or under the control of the garnishee. This opinion henceforth refers to this garnishment as "Garnishment Two."

On March 16, 1995, at the request of Beth's lawyer, a third execution was issued against John. At the direction of Beth's lawyer, the sheriff issued a garnishment to JDGDDSPC, attaching all assets of John in the possession or under the control of the garnishee. This opinion henceforth refers to this garnishment as "Garnishment Three."

We infer Beth's lawyer took the steps described in the three preceding paragraphs to collect the $225,000 award.

Almost fifteen months later, on June 7, 1996, at the request of Beth's lawyer, the clerk of the trial court issued an execution against John. In aid of the execution and at the direction of Beth's lawyer, the sheriff issued a garnishment to John and a garnishment to JDGDDSPC. These two garnishments are mentioned in the statement of facts in John's brief, but are unmentioned in his first point and the argument following it, hence we assume they are not in issue in this appeal. They are noted in this opinion only

to provide continuity to the saga in the trial court.

Pursuant to the June 7, 1996, execution, the clerk of the trial court issued a directive to the sheriff to levy on two parcels of real estate in Pemiscot County. The sheriff levied on the parcels and issued a notice they would be sold at public sale August 15, 1996.

We infer Beth's lawyer took the steps described in the two preceding paragraphs to collect the $225,000 award.

On August 5, 1996, John filed a "Motion for Contempt" in the trial court. The motion averred, *inter alia*, that the dissolution decree awarded John the "professional corporation" JDGDDSPC, and that one of the corporation's assets was a 1990 Toyota automobile. The motion further pled that Beth had possession of the Toyota when the decree was entered (September 21, 1993) and kept it until May 31, 1996 (a period of some 32 months), during which time its value diminished by $18,000. The motion prayed that Beth show cause why she should not be punished for contempt and why John should not recover the amount of the depreciation.

On August 15, 1996 (the day the sheriff was scheduled to sell the two parcels of land), the trial court entered the "Order Staying Execution Sale for One Month and Consolidating Issues for Submission to Special Master" mentioned earlier in this opinion. The order recited, *inter alia*, that John was endeavoring to obtain a loan "to pay off the balance [due on the $225,000 award]."

The August 15, 1996, order also stated the Master was to determine, among other issues, "all issues of contempt claimed by either party of [sic] against the other ... [and] allegations of wrongful garnishment as submitted in Circuit Court of Pemiscot County Case No. CV395–89CC." That number is different than the number assigned the instant case in the trial court. The instant case bears number CV391–235DR. The significance of this anomaly will become apparent later when we analyze John's first point.

As detailed earlier in this opinion, the Master held a hearing September 26, 1996, and filed his report in the trial court October 29, 1996. The Master's report contains a multi-

tude of findings, one of which is: "On March 10, 1996 [sic], another garnishment was issued to First State Bank attaching the funds of [JDGDDSPC]...." We conclude this finding refers to Garnishment Two, mentioned earlier in this opinion.

Another finding in the Master's report is: "On March 16, 1995, a garnishment was directed to [JDGDDSPC] attaching the property, money, etc. of the corporation...." We conclude this finding refers to Garnishment Three, mentioned earlier in this opinion.

It appears to us that the Master understood Garnishment Three differently than we do. As we comprehend Garnishment Three, it attached all assets of *John* in the possession or under the control of JDGDDSPC; it did not attach any of *JDGDDSPC's* assets. However, as shall become apparent hereafter, whether *our* notion or the Master's notion is correct is immaterial.

The Master's report contains further findings pertinent to John's first point. Those findings are:

"The answer to interrogatories by First State Bank listed one personal account, two corporate accounts, and one pension and profit sharing trust account. On March 10, 1995, the attorney for [Beth] wrote a letter to the attorney for First State Bank stating that he intended to pursue all of these funds.

[John] maintains that the two corporate accounts and the pension and profit sharing trust account were not subject to garnishment to collect a personal indebtedness.

[Beth] maintains that the corporate accounts were subject to garnishment because the corporation was the 'alter ego' of [John]....

[Beth] did not receive the funds from First State Bank although the accounts were 'frozen' for a time and some checks on the accounts were dishonored by the bank.

... [John's] personal account clearly was subject to garnishment.

[JDGDDSPC] is a professional corporation of which [John] is the sole shareholder and has complete domination. He can unilaterally control the amount of his compensation for his personal services in the practice of dentistry. He manipulated the funds of the corporation to defer income to such an extent that the Internal Revenue Service intervened to assess a deficiency against him. He also paid personal debts from the corporate account. For practical purposes [John] and his professional corporation are indistinguishable; it is his alter ego and the corporate accounts were subject to the garnishments. If this were not so he could live on other income and shelter his earnings for his professional services from garnishment indefinitely.

....

The allegations of wrongful executions and garnishments were not proven by the facts nor established under the law and there should be no recovery on these claims."

As set forth earlier in this opinion, the trial court filed a judgment June 26, 1997, confirming the Master's report.

John's first point:

"The trial court erred in adopting that portion of the report of the ... Master which found that the garnishment of the funds belonging to [JDGDDSPC] was proper and that the allegations of wrongful garnishment and execution were not proven by the facts nor established under the law based on a specific finding that the professional corporation was the alter ego of [John] and that thereby the corporate accounts were subject to the garnishments because this finding was against the weight of the evidence, unsupported by substantial evidence, and the trial court misapplied the law in that: (a) the professional corporation was not a party to the dissolution proceeding and under Missouri law, a marital dissolution decree may not affect property of a corporation that is not a party; (b) Missouri law requires that in order to pierce the corporate veil, the evidence must establish: (1) that the corporation is controlled and influenced by persons or by another corporation and, (2) that the corporate cloak was used as a subterfuge to defeat public convenience, to justify a

wrong, or to perpetuate a fraud, and there was no evidence to support these elements."

It is evident from the argument following the above point that John is complaining because the trial court denied a claim by him for "wrongful garnishment of the corporation." Neither the point nor the argument enlightens us about this "claim," nor do the point or argument reveal where the "claim" can be found in the record. We have combed the statement of facts in John's brief in search of a clue, but have discovered none.

The only document arguably constituting a "claim" by John against Beth in the record presented us is the "Motion for Contempt" filed by John August 5, 1996. As recounted earlier, the subject of that motion was a Toyota automobile, not any garnishment or execution.

In striving to figure out why John's "claim of wrongful garnishment of the corporation" does not appear in the record, we have deduced that the claim must have been filed in a different lawsuit—perhaps case number CV395–89CC, mentioned earlier in this opinion. As we noted there, the trial court's August 15, 1996, order listing the issues to be determined by the Master included "allegations of wrongful garnishment as submitted in . . . Case No. CV395–89CC."

Our search of the record has turned up no pleadings in case number CV395–89CC. The only inkling about them is a docket entry May 23, 1995, stating, in part: "BETH ANDREWS ANSWER TO PETITION FOR DAMAGES FOR WRONGFUL GARNISHMENT . . . filed by fax. . . ." The index in the legal file does not list· this pleading and we cannot find it in the legal file.

Rule 81.12(a) [16] provides, in pertinent part:

"The legal file shall always include, in chronological order: the pleadings upon which the action was tried. . . ."

It is the appellant's duty to provide a complete record on appeal for the determination of questions presented to the appellate court. *Morovitz v. Morovitz*, 693 S.W.2d 189, 191[5] (Mo.App. E.D.1985); *Coulter v. Michelin Tire Corp.*, 622° S.W.2d 421, 437[34] (Mo.App. S.D.1981), *cert. denied*, 456 U.S. 906, 102 S.Ct. 1752, 72 L.Ed.2d 162 (1982).

In a case of this complexity, we decline to attempt appellate review of a trial court ruling on issues joined by pleadings which John, the appellant, did not see fit to place before us. Such an undertaking would be an imprudent exercise in guesswork, accompanied by the risk of establishing bad precedent. We hold John's violation of Rule 81.12(a) bars review of his first point.

John's second point (the final claim of error in appeal 21808) avers the trial court erred in adopting a conclusion of the Master regarding "allegations of wrongful execution and garnishment of the funds of the [JDGDDSPC] Pension and Profit Sharing Trust." We glean from the argument following the point that John is complaining because the trial court denied an "action for wrongful garnishment of the pension funds." Neither the point nor the argument reveals where the pleading setting forth this "action" can be found in the record. We have scrutinized the statement of facts in John's brief in quest of a hint, but have found none.

Consequently, everything we said in regard to John's first point applies with equal force to his second. Consistent with our treatment of the first point, we hold the second is ineligible for review.

Before leaving the first and second points, we note John cites no authority supporting the notion that a trial court is empowered to enter a judgment in one case resolving issues in a different case without consolidating the cases. Consolidation of civil actions is authorized by Rule 66. We find no order in the record purporting to consolidate the instant case (CV391–235DR) with any other case per that rule.[17]

---

**16.** Rule references are to Missouri Rules of Civil Procedure (1997).

**17.** A recital in the judgment appealed from states the trial court took "judicial notice of the record appurtenant to the Circuit Court of Pemiscot County, Missouri, Division I, Cause No. CV395–89CC, styled First State Bank and Trust Company v. Beth Andrews (Gardner), John D. Gardner, John D. Gardner, D.D.S., P.C., John D. Gardner, D.D.S., P.C. Pension Trust and John D. Gardner,

That no consolidation occurred is borne out by John's notice of appeal in appeal 21808. The notice identifies the number of the case from which the appeal is taken as CV391–235DR (alone). The judgment itself displays only that number.

We recognize that the August 15, 1996, order enumerating the issues to be determined by the Master included issues in cases other than the instant case. We do not imply it was improper to refer issues in multiple cases to the Master. We merely point out there is nothing before us suggesting the trial court ever undertook to consolidate the instant case (CV391–235DR) with any other case. The effect of the judgment in the instant case on issues in any other case is not a subject requiring comment by us in appeal 21808. We leave the judgment as we find it.

■ One loose end remains in appeal 21808. As pointed out earlier in this opinion, after the mandate in the first appeal, the only pleadings we find in the record which present issues for the trial court's adjudication are Beth's "Motion for Contempt" filed May 24, 1995, and John's "Motion for Contempt" filed August 5, 1996.

The only reference to contempt in the judgment appealed from is:

"[Beth] is ordered to pay ... $4,000 ... to [John] to balance the equities of the parties as to their attorneys fees and the damage and deterioration to the 1990 Toy-

ota ... automobile within ... 30 ... days [after] the entry of this Order; that there is no present need for a coercive Order to the parties and that neither party should be granted further relief on the contempt motion[.]" [18]

■ The general rule is that a civil contempt order is not a final judgment for purposes of appeal until the order is enforced. *In re Marriage of Beaver,* 954 S.W.2d 717, 721[1] (Mo.App. S.D.1997); *State ex rel. Watson v. Watson,* 858 S.W.2d 841, 842[1] (Mo. App. S.D.1993). A discerning reader may thus wonder whether the judgment is appealable, inasmuch as the trial court did not undertake to enforce any provision of the dissolution decree or any provision of the judgment by coercion.

At the Master's hearing, Beth's lawyer acknowledged that during the time Beth's "Motion for Contempt" was pending, she, with counsel's assistance, was gradually able to get the items that were "the subject matter of the motion for contempt." Then, this:

"THE [MASTER]: ... So what is it that you are asking to be done in regard to the contempt motion ... ?

[Beth's lawyer]: Award the legal fees that we've incurred in order to try to get [John] to live up to the obligations of the judgment."

It is obvious from the above exchange that Beth, at the Master's hearing, abandoned her

D.D.S., P.C. Profit Sharing Trust, the Circuit Court of Pemiscot County, Missouri, Cause No. CV395–170CC, styled John D. Gardner, D.D.S., P.C., et al v. Beth Andrews (Gardner) and First State Bank and Trust Company, the United States District Court, Eastern District of Missouri, Southeast Division, Cause No. 1:96CV0113ERW, styled John D Gardner, D.D.S., P.C. et al v. Beth Andrews (Gardner), the United States District Court, Eastern District of Missouri, Southeastern Division, Cause No. 1:96CR00007SNL, styled United States Of America v. John D. Gardner, D.D.S...." We find nothing in the judgment appealed from purporting to adjudicate any issues in any of those actions. Furthermore, it appears First State Bank is a party to case number CV395–89CC (and also a party to case number CV395–170CC). Consequently, there may be issues involving First State Bank in those cases. The judgment appealed from resolves no issues involving First State Bank, hence if such judgment purported to adju-

dicate any issues between John and Beth in either of those cases, it would likely be unappealable for lack of finality. *See: Mohawk Flush Doors, Inc. v. Kabul Nursing Homes, Inc.,* 938 S.W.2d 347, 349[1–3] and [4, 5] (Mo.App. S.D. 1997).

18. A meticulous reader may recall that John's "Motion for Contempt" averred the Toyota was owned by JDGDDSPC. It thus appears the $4,000 awarded John from Beth should have been awarded to JDGDDSPC. However, as John's first point emphasizes, JDGDDSPC is not a party to this suit. Consequently, it appears the trial court would have been unable to award anything to JDGDDSPC. At the Master's hearing, John's lawyer said JDGDDSPC assigned the claim regarding the Toyota to John "so we didn't have to file a separate lawsuit." We find no such assignment in the record filed here.

request that John be held in contempt, and sought only an award of attorney fees.

John's lawyer, as we grasp his remarks at the Master's hearing, indicated that the only relief John wanted on his contempt motion against Beth was a monetary award "to restore the corporation to its status equal to either the diminution of the value [of the Toyota] or the cost of repair."

It is thus obvious that John, at the Master's hearing, abandoned his request that Beth be held in contempt, and sought only compensation for depreciation of the Toyota while Beth possessed it.

As we have seen, the trial court (upon recommendation of the Master) awarded John $4,000 from Beth to "balance the equities" regarding attorney fees and for "damage and deterioration" to the Toyota.

Apart from that award, the effect of the judgment was, in the main, to declare the rights and obligations of the parties regarding the E5 award, QDRO–1 and QDRO–2 (and perhaps to resolve issues about garnishments, a subject about which we have declined to speculate).

A declaratory judgment is appealable. Rule 87.11; *Fults v. Missouri Board of Probation and Parole*, 826 S.W.2d 103, 104–05[2] (Mo.App. W.D.1992). Accordingly, we hold the judgment appealed from in appeal 21808 is appealable. It is affirmed.

As reported in the third paragraph of this opinion, John's brief presents only one assignment of error in appeal 22070. That assignment (John's seventh point) charges the trial court with error in awarding Beth and her lawyers $7,500 from John for attorney fees and expenses in responding to appeal 21808.

An attorney fee award is within the trial court's discretion. *Mehra v. Mehra*, 819 S.W.2d 351, 356–57[14] (Mo. banc 1991). An appellate court will reverse such an award only if a trial court manifestly abuses its discretion. *Keefe v. Keefe*, 435 S.W.2d 313, 317[6] (Mo.1968).

We determine that the attorney fee award is supported by substantial evidence and is not against the weight of the evidence, that no error of law appears in the award, and that an opinion addressing the issue would have no precedential value. Accordingly, the judgment appealed from in appeal 22070 is affirmed in compliance with Rule 84.16(b)(1) and (5).

GARRISON, P.J., and BARNEY, J., concur.

## ON MOTION FOR REHEARING OR REHEARING BY THE COURT EN BANC and APPLICATION TO TRANSFER TO SUPREME COURT OF MISSOURI

### PER CURIAM.

In a post-opinion motion per Rule 84.17, John avers this court's opinion is wrong in four respects.

First, says John: "[T]his Court inadvertently misinterpreted and overlooked material matters of law and fact by holding that an alternate payee's rights to receive distribution from a pension plan are vested at the time the plan receives a copy of a domestic relations order not yet qualified and concluding that the issue of whether the trial court could properly prohibit the plan administrator from amending the plan after the plan received QDRO–1 is moot."

Although the motion does not identify the point relied on in John's brief which precipitated the ruling about which he now complains, we infer he is challenging this court's ruling on his sixth point. John's complaint, as we grasp it, is that Beth had no "vested" rights in the Plan until a domestic relations order awarding her an interest therein was "deemed qualified." John argues: "In the instant case, no domestic relations order was qualified until the trial court's June 26, 1997, order."

As explained in the opinion, the trial court signed QDRO–1 on March 1, 1996; John, administrator of the Plan, received a copy of QDRO–1 sometime between then and May 16, 1996, the date lawyer Seiler sent Beth's lawyer the letter mentioned in the opinion. We surmised in the opinion that at the time John received QDRO–1, the Plan allowed "lump sum distribution" to an alternate pay-

ee prior to John's attainment of retirement age. That assumption was apparently correct, as John does not now argue otherwise.

John's motion avers that an amendment to the Plan which took effect January 1, 1997, "does not provide for a lump sum distribution." The motion alleges the amended version of the Plan was in effect on the date the trial court signed QDRO–2 (June 24, 1997). Therefore, insists John, when Beth obtained her right to distribution from the Plan pursuant to 29 U.S.C. § 1056(d)(3)(H), the Plan did not provide for lump sum distribution. Consequently, reasons John, the judgment requires him to breach his fiduciary duties as Plan administrator by compelling him to distribute funds in a manner contrary to Plan documents.

The gist of John's contention is that when a pension plan administrator receives a domestic relations order awarding an alternate payee the right to receive a lump sum distribution as authorized by the existing terms of the plan, the plan administrator (or whoever is empowered to amend the plan) may nullify the right the alternate payee had at the time the domestic relations order was received by amending the plan between that date and the date the domestic relations order is determined to be a qualified domestic relations order (or the date a replacement domestic relations order meeting ERISA's requirements for qualification is received). As noted in the opinion, John cites no authority supporting that hypothesis.

John's contention was considered and rejected in our opinion. The opinion underscored the mischief that could result were John's hypothesis adopted. The opinion held Beth's right to receive a lump sum distribution from the Plan at the time John, the Plan administrator, received QDRO–1 could not thereafter be abrogated by amending the Plan.

Nothing in John's motion persuades us that our holding was improvident. Had we embraced John's position, we would have established precedent allowing a plan administrator to annul the right of an alternate

payee at whim. We are unpersuaded the Congress of the United States, in enacting ERISA, intended such knavery.

Our belief is buttressed by 29 U.S.C. § 1056(d)(3)(H)(i), which requires a plan administrator to separately account for the amounts which shall become payable to the alternate payee if the domestic relations order is ultimately determined to be a qualified domestic relations order. Nothing there suggests such amounts can be diminished or eliminated by amending the plan during the interval between receipt of the domestic relations order and the determination that it is qualified.

Having held Beth's right to receive distribution from the Plan is the right she had at the time John, the Plan administrator, received QDRO–1, our opinion concluded that any issue as to whether the trial court could properly prohibit John from amending the Plan after receiving QDRO–1 is moot, as any such amendment would not divest Beth of the right with which she was vested when John received QDRO–1, and no other alternate payee's rights are at issue in these appeals.[1]

For the forgoing reasons, we find no merit in John's first attack on the opinion.

John's second attack challenges the opinion's ruling on the second claim of error in the third point relied on in his brief. For the reasons set forth in the opinion, we held the assignment of error was not preserved for review. We adhere to that ruling.

The assignment of error, had it been preserved, would have hypothesized that the trial court "erred in calculating the amount of pension funds due [Beth] because its ... award of interest and earnings for the Plan funds as a whole from June 7, 1996 forward rather than awarding actual earnings on $216,252.50 which was segregated at the request of [Beth] and pursuant to court order ... was contrary to the law and a misapplication of the law in that ... 29 U.S.C. §§ 1104 and 1056 require a plan administrator to pay

---

1. As noted in the opinion, John's and Beth's shares in the Plan total 97.5 percent of the Plan's assets.

actual interest and earnings on segregated accounts and 29 U.S.C. § 1104(1) suggests that when a beneficiary exercises control over her portion of plan funds she must bear any losses resulting from this control."

The point relied on (from which the excerpt quoted in the preceding paragraph is taken) does not identify the portion of the judgment which contains the allegedly erroneous ruling. We have reexamined the argument which follows the point in John's brief. There, we are told that the trial court's "method of calculation of the amount due [Beth] is outlined in [QDRO–2] and in the [judgment filed June 26, 1997]." In studying the portions of those documents specified in John's argument, we find nothing that demonstrates the trial court, in John's words, "fail[ed] to consider actual earnings on $216,-252.50 which was segregated at the request of Beth." If indeed that was the effect of QDRO–2 or the June 26, 1997, judgment, it was John's burden, as the appealing party, to demonstrate the error. *Linzenni*, 937 S.W.2d at 725[3]. Nowhere in the argument in John's brief are we informed as to wherein or how QDRO–2 or the June 26, 1997, judgment reveal that the trial court committed the alleged error John unsuccessfully sought to present in the second component of his third point.

For the reasons above, we hold John's second attack on the opinion is meritless.

John's third attack impugns the opinion's holding on the fifth point relied on in his brief. In the opinion, we deduced from a reference to the legal file in the statement of facts in John's brief that the point was directed toward paragraph "D" of the June 26, 1997, judgment.[2] John's post-opinion motion confirms our supposition was correct.

John's motion avers our opinion wrongly holds there is no conflict between paragraph "D" of the judgment and Opinion 94–32A (an opinion letter of the Department of Labor, quoted in pertinent part in our opinion). John appears to construe paragraph "D" of the judgment as requiring that all expenses incurred in determining whether QDRO–1

and QDRO–2 satisfied ERISA requirements are "to be allocated to John as participant."

That was not the meaning our opinion ascribed to paragraph "D" of the judgment. Our opinion notes that reasonable expenses of administering the Plan may be paid from Plan assets (97.5 percent of which represent John's and Beth's shares). Our opinion further notes that payment of reasonable expenses of administering the Plan from its assets will have an adverse effect on the interests of *both* John and Beth until (if ever) Beth obtains everything due her from the Plan. However, our opinion emphasizes that reasonable expenses of administering the Plan do not include expenses incurred by John in an effort to benefit himself financially by defeating or delaying the E5 award. John should understand that, as he was present at the Master's hearing when lawyer Callison testified:

> "[T]he comment was made earlier by [John's lawyer] that ... [John] intended to charge his costs for all these lawyers and consultants and whatever to the plan. To the extent that these costs are unreasonable or benefits [sic] [John] or are designed to benefit [him] personally as opposed to benefitting the plan, that is an impermissible use of plan assets, and he should bear those costs himself or let his corporation bear those costs."

Nowhere in the fifth point relied on in John's brief, or in the argument following it, or in John's post-opinion motion does he identify the expenses he believes should be borne by the Plan instead of by him individually. We have reexamined the record and have espied no such itemization. Consequently, it was impossible for the trial court or this court to list the expenses John, as Plan administrator, could properly pay from Plan assets.

Given the arcane record, we construed paragraph "D" of the judgment as being consistent with the excerpt from Opinion 94–32A. Additionally, to ensure our holding was clear, our opinion cited ERISA provisions authorizing payment of reasonable expenses of administering a plan from plan assets. However, our opinion provided a caveat that if, when John pays Beth the E5 award, she

---

**2.** Paragraph "D" of the judgment is quoted in the opinion.

believes he, as Plan administrator, has improperly charged expenses against Plan assets that he should have paid personally, she can seek redress. John's motion concedes that remedy is available to Beth.[3]

John's third attack on the opinion is without merit.

John's final attack avers this court erred in affirming the trial court's award of $7,500 to Beth and her lawyers for attorney fees and expenses in responding to appeal 21808.

The trial court, apparently observant of John's demonstrated resolve to circumvent the dissolution decree—despite its affirmance in the first appeal—and apparently familiar with the tenacity of John's counsel, accurately foresaw that Beth would be compelled to respond to a multitude of intricate issues in appeal 21808. The length of our opinion and this post-opinion order confirm the trial court's clairvoyance.

John's complaint about the attorney fee award is too meritless to deserve further comment.

John's motion per Rule 84.17 is denied.

Simultaneously with that motion, John filed an application per Rule 83.02 for transfer of this case to the Supreme Court of Missouri. The application is likewise denied.

---

**3.** A footnote in John's motion reads: "If there is any question as to the propriety of allocating particular QDRO-related expenses to the plan, Beth, as well as any other participant or beneficiary could bring an action against John Under ERISA for breach of his fiduciary duty."